UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                       Plaintiff,                   5:25-cv-01040 (BKS/PJE)

v.

674,739.480211 USDT of Tether cryptocurrency, with an approximate value of $674,469.58,

                       Defendant.

**Appearances:**

*For United States of America:*
Adrian LaRochelle
Assistant United States Attorney
United States Attorney's Office
Northern District of New York
100 South Clinton Street
Syracuse, NY 13261

**Hon. Brenda K. Sannes, Chief United States District Judge:**

MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff the United States of America commenced this civil forfeiture action via verified complaint for forfeiture in rem against 674,739.480211 USDT of Tether cryptocurrency,[1] with an approximate value of $674,469.58, ("Defendant Cryptocurrency"), pursuant to 18 U.S.C. § 981(a)(1)(A) and § 981(a)(1)(C) as the proceeds of and property involved in violations of 18

---

[1] Tether or "USDT" is a type of cryptocurrency traded using blockchain technology. *See Samantha B. Larkin, Lipstick on A Slaughtered Piggybank: Civil Rico Against "Pig Butchering" Cryptocurrency Investment Schemes*, 30 Roger Williams U. L. Rev. 1, 1-11 (2025) (providing a "glossary" of cryptocurrency terms and explaining cryptocurrency's connection to "pig butchering" schemes). Tether, unlike Bitcoin, is a "stablecoin" that is tied to the value of fiat currency, meaning that the value of USDT is tied to the value of the US Dollar. *See id.*, at 11. *See also* OCC Inter. Ltr. 1172, 2020 WL 6490939, at *2 (Sept. 21, 2020). This is why the *amount* of Tether that comprises the Defendant Cryptocurrency is close in number to the *value* of the Defendant Cryptocurrency in USD.

1

U.S.C. §§ 1343 (wire fraud), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"). (Dkt. No. 1). Presently before the Court is the Government's motion for default judgment and for entry of a final order of forfeiture under Rule 55(b) of the Federal Rules of Civil Procedure and General Order #15 of the United States District Court for the Northern District of New York. (Dkt. No. 9-1). For the reasons that follow, the Government's motion for default judgment is denied without prejudice to renewal.

## II.  BACKGROUND

### A.  Factual Background

The complaint alleges that the Victim lost approximately 4.13 BTC (Bitcoin) in a fraud scheme known as a "pig butchering" scheme. (Dkt. No. 1, ¶¶ 16, 21). In May of 2024, the Victim "received an unsolicited invitation on WhatsApp for a 'Temporary WhatsApp Experience Group' to make money by trading Bitcoin." (Dkt. No. 1, ¶ 10). "The Victim joined the group and received instructions and 'mentoring' on how to proceed." (*Id.*). The Victim was instructed to use a trading platform that "had the appearance of a legitimate website." (*Id.* ¶ 11). "Several other purported users of that platform messaged that they were reaping huge profits." (*Id.*). The Victim "received an invitation to join a 'Permanent Telegram Group'" after "engaging in some activity" on the trading platform. (*Id.* ¶ 12). The Victim joined the group. (*Id.*).

At first, "the Victim appeared to make profits and was allowed to make a very small withdrawal of funds from his account." (*Id.*). The Victim's "assigned group mentor" encouraged him to "invest larger and larger sums of money." (*Id.*). "When the Victim attempted to withdraw some of his funds, he was told that he needed to reach a certain investment goal before the rules

permitted any withdrawals." (*Id.* ¶ 13). The Victim "made over a dozen deposits into the trading platform and repeatedly tried to withdraw from his 'account' but was given various excuses and reasons why the rules did not permit any withdrawals[.]" (*Id.*). The Victim was also told he must pay additional fees to an "associated platform" in order to withdraw his own money. (*Id.*).

The Victim was instructed to use online cryptocurrency trading websites. (*Id.* ¶ 14) "On screen, the fraudulent investment platforms appeared to be legitimate cryptocurrency exchanges[.]" (*Id.* ¶ 14). Victims could log in to these websites, trade, and see their investments grow. (*Id.*). "However, as soon as victims sent their cryptocurrency through the platforms, the funds then made their way through a complex laundering scheme." (*Id.*). "Between May 2024 and July 2024, the Victim was convinced to transfer custody of his cryptocurrency [ ] under the guise of customer deposits to these fake cryptocurrency exchanges." (*Id.* ¶ 15). "The Victim later discovered he was unable to withdraw funds he deposited to his accounts, and in some instances, he was extorted for more cryptocurrency when attempting to withdraw." (*Id.*). "The Victim realized that he was defrauded in late July 2024[,]" and lost approximately 4.13 BTC to the pig butchering scheme. (*Id.* ¶¶ 15, 16).

"[E]ach of the initial cryptocurrency investments were made in BTC on the Bitcoin blockchain." (*Id.* ¶ 16). The initial transactions occurred on Coinbase, "a known cryptocurrency exchange[.]" (*Id.*). "Through blockchain analysis, the victim's funds were traced to numerous other wallets." (*Id.*). In total, the Victim made 4.136202 Bitcoin (BTC) in deposits. (*Id.* ¶ 13). "From July 23, 2024 through July 30, 2024," the Victim sent 4.136202 BTC in six transactions from his Coinbase account to wallet 36p7UnQC42Qau4g42y33m4satxFMKbsAck ("Wallet 36p7Un"). (*Id.* ¶ 17). The Government alleges that "3.58664 BTC was traced to wallet 3HzHQK9YNUskTpHGRpuTtYu4TzSUD14gRL" ("Wallet 3HzHQK9Y"). (*Id.*). "Wallet

3

3HzHQK9Y then sent 2.74 BTC in seven transactions to Thorchain to exchange to Tether[.]" (*Id.*).[2]

"Additional tracing identified seven transactions totaling 286,542.299 USDT to wallet 0xFf4bBDc981EbE275630704E680C2086498576909" ("Wallet 0xFf4bBD"). (*Id.* ¶ 18). On December 15 and 17, 2024, Wallet 0xFf4bBD then "exchanged the Tether onto the Tron blockchain"[3] in two transactions to wallet TDoj7UUpKZieJFK5CHfZcuDpJkWw55Dg3J ("Wallet TDoj7UUp"). (*Id.*). On December 15, 2024, Wallet 0xFf4bBD exchanged the Tether to wallet TDoj7UUp for 118,743.317351 USDT TRON. (*Id.*). That same day, wallet TDoj7UUp transferred 194,479.719531 USDT TRON to wallet TNj4y6nnTX ("Target Wallet"). (*Id.* ¶ 19). On December 17, 2024, wallet 0xFf4bBD exchanged the Tether to wallet TDoj7UUp for 167,225.897073 USDT TRON. (*Id.* ¶ 18). Again, on that same day, wallet TDoj7UUp transferred 249,473.322623 USDT TRON to the Target Wallet. (*Id.* ¶ 19). "A total of 443,953 USDT TRON was traced from the Victim's accounts to the Target Wallet." (*Id.*).

"The tracing of the stolen funds found that many transfers that took place between the initial theft of the Victim's funds were broken down into many smaller transactions and deposits, consolidated into larger 'group' wallets, nested into a wallet within another wallet, or split apart into several smaller transactions along the way[.]" (*Id.* ¶ 20). "The funds at the time of seizure in the Target Wallet had been transferred between many other wallets prior to their deposit into the Target Wallet." (*Id.* ¶ 21). The Target Wallet received funds from two wallets, which received funds from five wallets; those five wallets received funds from twenty-four wallets, which

---

[2] The verified complaint explains that "cryptocurrency can be converted into different types of coins to enable trading on different platforms." (*Id.*). "In this instance, the traced funds were converted form Bitcoin into Tether." (*Id.*).
[3] The Tron blockchain is "simply a different network, but it retains the same value per USDT token[.]" (*Id.*).

4

received funds from sixty-eight wallets. (*Id.*). "This activity is consistent with money laundering and is commonly observed in pig butchering schemes." (*Id.*).

### B.     Procedural Background

On August 4, 2025, the Government filed its verified complaint for forfeiture in rem. (Dkt. No. 1). That same day, the Clerk of Court issued a warrant of arrest of articles in rem for Defendant Cryptocurrency. (Dkt. No. 2). The warrant was executed on August 6, 2025. (Dkt. No. 4, at 4). Beginning on August 7, 2025, and for thirty consecutive days thereafter, the Government published a public notice on an official government forfeiture website, www.forfeiture.gov. (Dkt. No. 9-2, ¶ 5; Dkt. No. 5). Government counsel asserts that there are no known potential claimants in this case. (Dkt. No. 9-2, ¶ 4).

On October 10, 2025, the Government requested an entry of default and submitted a supporting affidavit. (Dkt. Nos. 6; 6-1). On October 15, 2025, the Clerk entered default of Defendant Cryptocurrency. (Dkt. No. 7). The Government filed the instant motion on October 21, 2025. (Dkt. No. 9). No verified claim or answer has been filed in this action, and the last date for potential claimants to file a claim was October 6, 2025. (Dkt. No. 9-2, ¶ 6).

## III.    STANDARD OF REVIEW

### A.     Default Judgment

"Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). First, under Rule 55(a), the plaintiff must obtain a clerk's entry of default. Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); *see also* N.D.N.Y. L.R. 55.1 (requiring a party seeking a clerk's entry of

default to "submit an affidavit showing that (1) the party against whom it seeks a judgment . . . is not an infant, in the military, or an incompetent person (2) a party against whom it seeks a judgment for affirmative relief has failed to plead or otherwise defend the action . . . and (3) it has properly served the pleading to which the opposing party has not responded"). Second, after a default has been entered against a defendant, and the defendant fails to move to set aside the default under Rule 55(c), the plaintiff must "apply to the court for entry of a default judgment" under Rule 55(b)(2). *Priestley*, 647 F.3d at 505; *see also* N.D.N.Y. L.R. 55.2(b) ("A party shall accompany a motion to the Court for the entry of a default judgment, pursuant to Fed. R. Civ. P. 55(b)(2), with a clerk's certificate of entry of default . . . a proposed form of default judgment, [] a copy of the pleading to which no response has been made, . . . [and] an affidavit.") (amended 2026).[4] "Notice of the application must be sent to the defaulting party so that it has an opportunity to show cause why the court should not enter a default judgment." *United States v. One 2012 Toyota Venza XLE, VIN # 4T3B3BB7CU073918*, No. 19-cv-928, 2020 WL 7407749, at *2, 2020 U.S. Dist. LEXIS 190799, at *4 (N.D.N.Y. Oct. 15, 2020) (citation omitted).

By failing to answer a complaint or oppose a motion for default judgment, a party is deemed to have admitted the well-pleaded factual allegations in the complaint. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability."); *United States v. Two Hundred & Eighty Thousand Dollars & Zero Cents More or Less, in United States Currency*, No. 20-cv-4442, 2021 WL 2980540, at *3, 2021 U.S. Dist. LEXIS 131325, at *6

---

[4] The Court notes that, at the time the Government filed its motion for default judgment, the Local Rules did not require submission of a memorandum of law. N.D.N.Y. L.R. 55.2(b) now reads:
> Prior to filing a motion for default judgment, the party must first obtain a Clerk's Certificate of Entry of Default as required by L.R. 55.1. The motion, pursuant to Fed. R. Civ. P. 55(b)(2), shall include a memorandum of law pursuant to Local Rule 7.1 and a proposed order. The moving party shall also include in its application an affidavit of the moving party or the moving party's attorney setting forth facts as required by L.R. 55.2(a).

(E.D.N.Y. July 14, 2021) ("A court considering a motion for default judgment 'deems all the well-pleaded allegations in the pleadings to be admitted[.]'" (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997))). However, "a pleading's legal conclusions are not assumed to be true." *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 265 (E.D.N.Y. 2019) (citation omitted). Before entering default judgment, a court must review the complaint to determine whether the plaintiff has stated a valid claim for relief. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *Two Hundred & Eighty Thousand Dollars & Zero Cents More or Less*, 2021 WL 2980540, at *3, 2021 U.S. Dist. LEXIS 131325, at *6. The court "need not agree that the alleged facts constitute a valid cause of action." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)); *see also United States v. $73,313.00 in U.S. Currency*, No. 22-cv-612, 2023 WL 1102601, at *2, 2023 U.S. Dist. LEXIS 14866, at *4 (N.D.N.Y. Jan. 30, 2023) ("[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." (quoting *Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 186 (E.D.N.Y. 2009))).

### B.     Forfeiture in Rem

"In rem forfeiture actions are governed by Rule G of the [Supplemental Rules] and the Civil Asset Forfeiture Reform Act of 2000," 18 U.S.C. § 981 et seq. *See United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014). "The Federal Rules of Civil Procedure also apply to [forfeiture in rem] proceedings except to the extent that they are inconsistent with the[] Supplemental Rules." Supp. R. A(2); *accord United States v. Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-Eight Cents ($417,143.48)*, No. 13-cv-5567, 2015 WL 5178121, at *4, 2015 U.S. Dist. LEXIS 117692, at *11 (E.D.N.Y. Sept. 2, 2015),

*aff'd sub nom. United States v. $417,143.48, Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-Eight Cents*, 682 F. App'x 17 (2d Cir. 2017).

Under Supplemental Rule G, a complaint for forfeiture in rem must:

> (a) be verified;
> (b) state the grounds for subject-matter jurisdiction, in rem jurisdiction over the defendant property, and venue;
> (c) describe the property with reasonable particularity;
> (d) if the property is tangible, state its location when any seizure occurred and—if different—its location when the action is filed;
> (e) identify the statute under which the forfeiture action is brought; and
> (f) state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.

Supp. R. G(2). Furthermore, "[i]f the defendant is not real property . . . the clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control." Supp. R. G(3)(b)(i).

Supplemental Rule G(4) sets forth the notice requirements for forfeiture in rem actions: the government "must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the government," Supp. R. G(4)(b)(i), and notice by publication, which is required unless certain conditions are met, can be effectuated by "posting a notice on an official internet government forfeiture site for at least 30 consecutive days," Supp. R. G(4)(a)(iv)(C).

Once the government has commenced a forfeiture in rem action, a claimant "who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Supp. R. G(5)(a)(i); *accord Vazquez-Alvarez*, 760 F.3d at 197. The claimant must file their claim "not later than 30 days after the date of service of the Government's complaint or, as applicable, not later than 30 days after the date of final publication of notice of the filing of the complaint." *See* 18 U.S.C. § 983(a)(4)(A); *accord* Supp.

R. G(5)(a)(ii). "A claimant must serve and file an answer to the complaint or a motion under Rule 12 within 21 days after filing the claim." Supp. R. G(5)(b). However, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D).

"[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

## IV.   DISCUSSION

### A.   Rule 55 and Supplemental Rule G

As an initial matter, the Court must determine whether the Government has complied with the procedural requirements for obtaining default judgment under Rule 55 of the Federal Rules of Civil Procedure. On October 10, 2025, the Government requested a clerk's entry of default under Federal Rule of Civil Procedure 55(a) and General Order #15, and the Government submitted an affidavit affirming that (1) "[t]here are no known potential claimants in this case"; (2) "public notice of this action was published on an official government forfeiture site . . . for thirty consecutive days"; (3) the Government "believes it has taken reasonable steps to attempt to provide notice of this action to all known, and unknown, potential claimants[;] [s]uch potential claimants have failed to plead or otherwise defend the action, as provided by the Supplemental Rules"; (4) "[n]either a verified claim nor an answer has been filed in this action, and the last date for potential claimants to file a claim" had passed; and (5) "no person thought to have an

9

interest in the Defendant Cryptocurrency is an infant, incompetent, or presently engaged in military service." (Dkt. No. 6-1, ¶¶ 4–8). Thus, on October 15, 2025, the Government received a clerk's entry of default. (Dkt. No. 7). The Government then moved for default judgment and attached the clerk's certificate of entry of default, (Dkt. No. 9-5), a proposed form of default judgment, (Dkt. No. 9-4), a copy of the pleading to which no response has been made, (Dkt. No. 9-6), and a supporting affidavit, (Dkt. No. 9-2).

Because the Government brings an action for forfeiture in rem, the Court must also examine whether the Government complied with the requirements of the Supplemental Rules. *See Vazquez-Alvarez*, 760 F.3d at 197. In compliance with Supplemental Rule G(3)(b)(i), the Clerk issued a warrant to arrest Defendant Cryptocurrency. (Dkt. Nos. 2, 4). However, the record does not reflect whether the Government's posted notice is sufficient to satisfy Supplemental Rule G(4). While the Government published public notice of the action on an official government forfeiture website, www.forfeiture.gov, from August 7, 2025 to September 5, 2025, (Dkt. No. 5, at 3; Dkt. No. 9-2, ¶ 5), it is not clear that the public notice "describe[s] the [Defendant Cryptocurrency] with reasonable particularity" in satisfaction of Supplemental Rule G(4)(a)(ii)(A). The public notice identifies Defendant Cryptocurrency as "674,739.480211 USDT from Tether account number #XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX5usu, held in the name of Best Acct# XXXXXXXXXXXXXXXXXXXXXXXXX (25-FBI-003794) seized from Tether on May 22, 2025 in Albany, NY." (Dkt. No. 5, at 2). But the verified complaint indicates Tether cryptocurrency was traced from the Victim's accounts to a "Target Wallet" identified as "Wallet TNj4y6nnTX," and funds were seized from the Target Wallet. (Dkt. No. 1, ¶¶ 19, 21). There is nothing in this record, beyond the notice of forfeiture, regarding a Tether account ending in 5usu; the Government has not provided any explanation of its

10

connection to the Target Wallet or how the description in the public notice would give sufficient notice to a potential claimant.

Moreover, the Government must send notice "to any person who reasonably appears to be a potential claimant." Supp. R. G(4)(b)(i). The Government has submitted an affidavit from Government counsel stating that "[t]here are no known potential claimants in this case," without any explanation. (*See* Dkt. No. 9-2, ¶ 4). There is no indication that the Government attempted to contact any email or mailing address associated with the Tether account seized. *See, e.g., United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 4-5 (D.D.C. 2020) (finding government's obligation to provide direct notice to potential claimants satisfied where government sent notice via certified mail and email addresses to potential claimants, relying on "know-your-customer" information obtained from cryptocurrency exchanges); *see also United States v. Starling*, 76 F.4th 92, 96 n.2 (2d Cir. 2023) ("The government need not provide formal service of process in a civil forfeiture proceeding; it must only give notice 'to any person who reasonably appears to be a potential claimant on the facts known to the government,' and it may do so by any 'means reasonably calculated to reach the potential claimant.'" (quoting Supp. R. G(4)(b)(i), (iii)(A))).

Because there are additional deficiencies in the verified complaint, the Court will also consider whether the Government has satisfied the requirements of Supplemental Rule G(2). As a preliminary matter, the complaint is verified in satisfaction of Supplemental Rule G(2)(a), (Dkt. No. 1, at 1, 7); states the grounds for subject-matter jurisdiction, in rem jurisdiction over Defendant Cryptocurrency, and venue in satisfaction of Supplemental Rule G(2)(b), (*id.* ¶¶ 7-9); describes the property with reasonable particularity in satisfaction of Supplemental Rule G(2)(c), (*id.* ¶ 5); states Defendant Cryptocurrency's location when seizure occurred and when the action

was filed in satisfaction of Supplemental Rule G(2)(d), (*id.* ¶¶ 5-6); and identifies the statute under which the forfeiture action is brought in satisfaction of Supplemental Rule G(2)(e), (*id.* ¶¶ 1-3).

At issue here is whether the verified complaint "state[s] sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *See* Supp. R. G(2)(f). And because the Government's theory of forfeiture is that Defendant Cryptocurrency was "used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense," the Government must "establish that there was a substantial connection between" Defendant Cryptocurrency and the underlying criminal offenses. *See* 18 U.S.C. § 983(c)(3).

**B.     Sufficiency of the Verified Complaint**

The Government premises its forfeiture in rem action on 18 U.S.C. § 981(a)(1)(A) and § 981(a)(1)(C), as both "property involved in" and "the proceeds of" violations of 18 U.S.C. §§ 1956, 1957, and 1343. (Dkt. No. 1, ¶ 1). Sections 1956 and 1957 are federal money laundering statutes, and section 1343 criminalizes wire fraud. *See United States v. Ross*, 161 F.4th 100, 107 n.5 (2d Cir. 2025) (explaining the federal money laundering statutes and their connection to wire fraud). As explained more fully below, the Government essentially alleges (1) that Defendant Cryptocurrency "constitutes or is derived from proceeds traceable to" wire fraud, under 18 U.S.C. § 981(a)(1)(C), and (2) that Defendant Cryptocurrency is property "involved in a transaction or attempted transaction" in violation of federal money laundering statutes (or "traceable to such property"), under 18 U.S.C. § 981(a)(1)(A). The Court considers each claim in turn.

**1.     Forfeiture Under Section 981(a)(1)(C)**

Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [ ] any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." "Specified unlawful activity" within the meaning of section 1956(c)(7) includes wire fraud under 18 U.S.C. § 1343. *See id.* §§ 1956(c)(7)(A), 1961(1); *see also United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred Fifty-Three Dollars & Zero Cents Seized From JP Morgan Chase NA Acct. No. XXXXXXXX Held in Name of Jiawig Trade Inc.*, No. 23-cv-9585, 2025 WL 923412, at *4, 2025 U.S. Dist. LEXIS 57796, at *11 (E.D.N.Y. Mar. 27, 2025) (noting that "enumerated violations [within the meaning of section 981(a)(1)(C)] include wire fraud under 18 U.S.C. § 1343").

The essential elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires[5] to further the scheme." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (quoting *Fountain v. United States,* 357 F.3d 250, 255 (2d Cir. 2004). "The mail and wire fraud statutes prohibit the use of both means of transmission in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Fountain*, 357 F.3d at 255.

Here, the verified complaint describes a scheme in which victims were led to deposit money or cryptocurrency into fraudulent online investment platforms, which appeared to be legitimate cryptocurrency exchanges. (*See* Dkt. No. 1, ¶¶ 10-16). The complaint adequately alleges a wire fraud scheme to defraud "investors" of their cryptocurrency within the meaning of section 1343. *C.f. Jiawig,* 2025 WL 923412, at *2, 2025 U.S. Dist. LEXIS 57796, at *3-4

---

[5] "[U]se of the internet is generally sufficient to establish interstate wire usage for the purpose of wire fraud." *See Hagigi v. Yukhananov*, No. 23-cv-5549, 2024 WL 4028333, at *6 n.5, 2024 U.S. Dist. LEXIS 157984, at *18 n.5 (E.D.N.Y. Sept. 3, 2024) (collecting cases).

(finding, on review of report-recommendation pertaining to civil forfeiture complaint, that Government sufficiently alleged elements of wire fraud; Government described an investment scheme utilizing "fraudulent investment and/or cryptocurrency trading applications" and victims of scheme sent money to various fraudulent investment platforms and "websites purporting to be legitimate cryptocurrency exchanges and/or investment platforms"); *United States v. 0.40401694 Bitcoin Seized from Binance User ID 36895141*, No. 25-5611, 2026 WL 228831, at *1, 2026 U.S. App. LEXIS 2923, at *2-4 (6th Cir. Jan. 28, 2026) (affirming government forfeiture of cryptocurrency seized in connection with wire fraud scheme).

However, it is not clear from the verified complaint that Defendant Cryptocurrency "constitutes or is derived from proceeds *traceable to*" the alleged wire fraud within the meaning of section 981(a)(1)(C), because the verified complaint does not adequately explain the sequence of transfers connecting the Victim to the Target Wallet where the Defendant Cryptocurrency was seized. The Government alleges that Wallet 3HzHQK9Y sent 2.74 BTC in seven transactions to Thorchain to exchange to Tether. (Dkt. No. 1, ¶ 17). The Government further alleges that "[a]dditional tracing identified seven transactions totaling" 286,542.299 USDT to Wallet 0xFf4bBD, but it does not identify the origin of those seven transactions. (*See id.* ¶ 18). The Government does not allege that Wallet 3HzHQK9Y was the source of the 286,542.299 USDT. There is no description of "additional tracing," and how the alleged "[a]dditional tracing" connects Wallet 3HzHQK9Y to Wallet 0xFf4bBD. (*See id.*).[6]

---

[6] Further confusing the matter, the Government has only alleged that 2.74 of the original 4.13 BTC was sent to Thorchain to exchange to Tether. (Dkt. No. 1, ¶ 17). It is not clear to the Court how (or if) the remainder of the Victim's Bitcoin was exchanged to Tether. It is also not clear how 2.74 BTC became the 443,953 USDT TRON which the complaint asserts was traced from the Victim's accounts to the Target Wallet. (See Dkt. No. 1, ¶ 19). Even on October 6, 2025, when Bitcoin closed at a high of $124,286.00, 2.74 BTC would only have been worth $340,543.64. *See BTC/Historical*, Nasdaq, https://www.nasdaq.com/market-activity/cryptocurrency/btc/historical (last visited Mar. 2, 2026).

The complaint also fails to explain how the entire 674,739.480211 USDT seized "constitutes or is derived from proceeds traceable to" the wire fraud perpetrated upon the Victim, *see* 18 U.S.C. § 981(a)(1)(C), where the verified complaint alleges that only 443,953 USDT TRON was traced from the Victim's accounts, *see Jiawig*, 2025 WL 923412, at *5, 2025 U.S. Dist. LEXIS 57796, at *13-15 ("The Government appears to argue that because it has alleged that some of Defendant Funds may be attributed to known victims who transferred money to the fraudulent Jiawig Account, all funds in the account are proceeds of the Investment Fraud Scheme. [ ] The Court declines to draw this inference because the Amended Complaint indicates that the Jiawig Account received funds from other sources."). Therefore, at this stage the Government has not met its burden of showing, by a preponderance of the evidence, that Defendant-Cryptocurrency "constitutes or is derived from proceeds traceable to a violation" of the wire fraud statute. *See* 18 U.S.C. § 983(c)(1); *see also* Supp. R. G(2)(f); 18 U.S.C. § 981(a)(1)(C).

        **2.**        **Forfeiture Under Section 981(a)(1)(A)**

Under 18 U.S.C. § 981(a)(1)(A), and as relevant here, "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957 [ ] of this title, or any property traceable to such property," is "subject to forfeiture to the United States." "Courts in this district have held that '[t]he term 'involved in' refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense.'" *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 563 (S.D.N.Y. 2011) (collecting cases). The Second Circuit "has affirmed forfeiture of property as 'involved in' money laundering transactions when it has 'served as a conduit for the proceeds of the illegal transactions.'" *Id.* (citing *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008)).

### a. Section 1956

Section 1956 provides in relevant part that:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> > (A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .
> >
> > (B) knowing that the transaction is designed in whole or in part—
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
>
> shall [be guilty of an offense].

*Id.* § 1956(a).[7] *See also United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006).

"[T]he concealment element of the money laundering statute requires that the purpose, not merely the effect, of the endeavor must be to conceal or disguise a listed attribute of the proceeds." *United States v. Garcia*, 587 F.3d 509, 512 (2d Cir. 2009) (citing *Cuellar v. United States*, 553 U.S. 550, 564–68 (2008)); *see also United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) ("*Cuellar* confirms that a conviction for . . . money laundering [under § 1956(a)(1)(B)(i)] . . . requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds.").

Under 18 U.S.C. § 1956(c)(4), "the term 'financial transaction' means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or

---

[7] Section 1956 includes other provisions not apparently implicated here. *See id.* § 1956(a)(1)(A)(ii), (a)(1)(B)(ii), (a)(3).

(iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." As noted above, the term "specified unlawful activity" includes, among other offenses, wire fraud in violation of 18 U.S.C. § 1343. *See* 18 U.S.C. § 1956(c)(7)(A).

"[W]hen the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction" and "funds become proceeds when they are derived from an already completed offense, or a *completed phase* of an ongoing offense." *Jiawig*, 2025 WL 923412, at *7, 2025 U.S. Dist. LEXIS 57796, at *18 (quoting *United States v. Szur*, 289 F.3d 200, 213-14 (2d Cir. 2002).

Here, the Government alleges that "many transfers that took place between the initial theft of the Victim's funds were broken down into many smaller transactions and deposits, consolidated into larger 'group' wallets, nested into a wallet within another wallet, or split apart into several smaller transactions along the way, all of which demonstrate the efforts taken to obfuscate the true origin of funds." (Dkt. No. 1, ¶ 20). Accordingly, the Court reads the verified complaint to allege that the Victim's funds were involved in "concealment" money laundering under section 1956(a)(1)(B)(i). *See Jiawig*, 2025 WL 923412, at *6, 2025 U.S. Dist. LEXIS 57796, at *16-17 ("Section 1956(a)(1)(B)(i) requires that (1) 'there be proceeds from a specified unlawful activity, known to be such by the defendant' and (2) 'the defendant conduct or attempt to conduct a financial transaction with those proceeds, knowing the transaction is designed to conceal or disguise the nature or source of the funds.'" (quoting *Szur*, 289 F.3d at 213)).

But the facts as alleged in the verified complaint do not support a reasonable belief that the Government will be able to meet its burden of proof at trial in establishing that Defendant

Cryptocurrency is property "involved in a transaction or attempted transaction in violation of" section 1956, *see* 18 U.S.C. § 981(a)(1)(A), because—as explained above—the Government has not adequately alleged the connection between Defendant Cryptocurrency and the wire fraud, *see* discussion *supra* Section IV.B.1. The Government also does not allege facts supporting the forfeiture of the entire 674,739.480211 USDT; it is not clear to the Court how the entire 674,739.480211 USDT was "involved in a transaction or attempted transaction in violation of section 1956," *see* 18 U.S.C. § 981(a)(1)(A), where the verified complaint alleges that only 443,953 USDT TRON was traced from the Victim's accounts.[8] As a result, the Government has not met its burden to establish a "substantial connection between" Defendant Cryptocurrency and a money laundering offense under section 1956. *See* 18 U.S.C. § 983(c)(3).

### b. Section 1957

Section 1957 "criminalizes 'knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]'" *United States v. Ross*, 161 F.4th 100, 108 (2d Cir. 2025) (quoting 18 U.S.C. § 1957(a)). "Specified unlawful activity" includes wire fraud under section 1343, by reference to section 1956. *See* 18 U.S.C. § 1957(f)(3). A violation of section 1957 "requires a showing *first,* that the defendant knowingly engaged in a monetary transaction; *second,* that the defendant knew the property was criminally derived; and *third,* that the property

---

[8] Some courts have held that the entire contents of an account used to "facilitate" money laundering are subject to forfeiture as property "involved in" money laundering, under 18 U.S.C. § 981(a)(1)(A). *See, e.g., Jiawig,* 2025 WL 923412, at *8, 2025 U.S. Dist. LEXIS 57796, at *24 (finding "that the entirety of the Defendant Funds, inclusive of the $215,497 not traced to known victims of the Investment Fraud Scheme, [was] forfeitable under section 981(a)(1)(A) as property involved in, or traceable to property involved in, money laundering"); *United States v. Kenner*, 443 F. Supp. 3d 354, 381 (E.D.N.Y. 2020) (rejecting argument that only unlawful proceeds actually "obtained" by fraudster were subject to forfeiture and holding that commingled "investment funds, as a whole, would be forfeitable"). However, because the Government has not adequately explained the connection between Defendant Cryptocurrency and the underlying specified unlawful activity of wire fraud, at this time the Court cannot decide whether the entire amount of Defendant Cryptocurrency is subject to forfeiture.

was of a value greater than ten thousand dollars." *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 371 (S.D.N.Y. 2008) (citation omitted). "The key term is 'criminally derived property,' which is defined in section 1957 as 'any property constituting, or derived from, proceeds obtained from a criminal offense.'" *Id.* (quoting 18 U.S.C. § 1957(a), (f)(2)). "This refers to funds obtained from a prior, separate criminal act since money laundering must be a crime distinct from the crime by which the money is obtained." *Id.* (internal quotations and citation omitted). Under section 1957(f)(1), the term "monetary transaction" means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5)[9] of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B)[10] of this title[.]"

As set forth above, because the verified complaint does not adequately explain the sequence of transfers connecting the Victim to the Target Wallet where the Defendant Cryptocurrency was seized, or allege facts supporting the forfeiture of the entire 674,739.480211 USDT, the Government has not met its burden to establish that Defendant Cryptocurrency is property "involved in a transaction or attempted transaction in violation of" section 1957. *See* 18 U.S.C. § 981(a)(1)(A). Also, to the extent the Government seeks to proceed on this theory it must brief the issue of whether the underlying cryptocurrency transactions constitute "monetary transactions" within the meaning of section 1957(f)(1), including whether the cryptocurrency constitutes "funds" or a "monetary instrument" as defined in 1956(c)(5), whether any of the

---

[9] Under section 1956(c)(5), "the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery[.]"
[10] Under 1956(c)(4)(B), "financial transaction" means "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree[.]"

exchanges passed through a "financial institution" as defined in section 1956, or whether the exchange of cryptocurrency is a "financial transaction" under 1956(c)(4)(B).

## V.    LEAVE TO RENEW

The Government has failed to establish that its posted notice is sufficient to satisfy Supplemental Rule G(4), and that it has met its burden under sections 983(c)(1) and 983(c)(3) to show that Defendant Cryptocurrency is subject to forfeiture—either as "property involved in a transaction or attempted transaction" in violation of sections 1956 or 1957, or as "the proceeds of" a violation of section 1343. *See* 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C). Accordingly, the Government's motion for default judgment is denied without prejudice to renewal. The Government may renew their motion for default judgment by filing, within thirty days, affidavits or evidence necessary to address the deficiencies identified by the Court, and a memorandum of law addressing how the Court should apply the provisions of Supplemental Rules G(4), G(2)(f), and 18 U.S.C. § 981(a)(1)(A), § 981(a)(1)(C), § 983(c)(1), and § 983(c)(3) in its analysis of the Government's renewed motion.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Government's motion for default judgment, (Dkt. No. 9-1), is **DENIED** without prejudice; and it is further

**ORDERED** that the Government may renew their motion for default judgment by filing, within thirty days of the date of this Order, a renewed motion for default judgment with affidavits or evidence and a memorandum of law addressing the issues raised in this decision.

**IT IS SO ORDERED.**

Dated: March 3, 2026
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge