**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

Plaintiff, 5:25-cv-01040 (BKS/PJE)

v.

674,739.480211 USDT of Tether cryptocurrency,
with an approximate value of $674,469.58,

Defendant.

---

**Appearances:**

*For United States of America:*
Adrian LaRochelle
Jeffrey Brown
Assistant United States Attorneys
United States Attorney's Office
Northern District of New York
100 South Clinton Street
Syracuse, NY 13261

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff the United States of America brought this civil forfeiture action via verified complaint for forfeiture in rem against 674,739.480211 USDT of Tether cryptocurrency, with an approximate value of $674,469.58, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) as the proceeds of, and property involved in, violations of 18 U.S.C. §§ 1343 (wire fraud), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rule G"). (Dkt. No.

1). Presently before the Court is the Government's renewed motion for default judgment. (Dkt. No. 17-1). For the reasons that follow, the Government's motion for default judgment is granted.

## II. RELEVANT PROCEDURAL BACKGROUND

The Government filed a verified complaint for forfeiture in rem on August 4, 2025. (Dkt. No. 1). On October 10, 2025, the Government requested a clerk's entry of default under Federal Rule of Civil Procedure 55(a) and General Order #15 of the United States District Court for the Northern District of New York. (Dkt. No. 6-1, ¶¶ 4–8). After reviewing the Government's motion, the Court found that it could not determine whether the Government met its burden to establish (1) that the Government satisfied its notice requirements under Supplemental Rule G(4), (Dkt. No. 13, at 10–11); and (2) that the verified complaint stated sufficient facts to support a reasonable belief that the Defendant Cryptocurrency was subject to forfeiture under Supplemental Rule G(2)(f) as proceeds of wire fraud and property involved in money laundering pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), (*id.* at 14–15, 17–19).

The Court granted leave to renew, (*id.* at 20), and on May 4, 2026, the Government filed the instant motion, (Dkt. No. 17). The Court incorporates the factual and procedural background and applicable law as set forth in its prior decision, (Dkt. No. 13), and presumes familiarity with those matters for the purposes of this decision.

## III. DISCUSSION

### A. Notice under Supplemental Rule G(4)

"In rem forfeiture actions are governed by Rule G of the [Supplemental Rules] and the Civil Asset Forfeiture Reform Act of 2000 ('CAFRA')." *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014); *see* 18 U.S.C. § 981 *et seq.* Under Supplemental Rule G(4), "[a] judgment of forfeiture may be entered only if the government has published notice of the action," and that notice must "describe the property with reasonable particularity." In addition, the

Government "must send notice of [a civil forfeiture] action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim." Supp. R. G(4)(b)(i). However, the Court identified two potential inadequacies with the notice provided by the Government.

**1. Notice by Publication**

First, the public notice published by the Government identified the Defendant Cryptocurrency using an account number that did not appear to match the wallet number included in the verified complaint. (*See* Dkt. No. 13, at 10. *Compare* Dkt. No. 5, at 2 *with* Dkt. No. 1, ¶¶ 19, 21). In its renewed motion, the Government has clarified that "the unique nature of cryptocurrency wallet addresses makes the seized wallet identifiable by either set of characters," and that "several parties were able to sufficiently link the wallet referenced in the government's notice with the Target Wallet and contact Tether's Compliance Department." (Dkt. No. 17-2, at 2). The Government has also submitted a supplemental affidavit from Special Agent Daniel Capone III, in which Special Agent Capone clarifies the full wallet address, which begins with "TNj4y6nnTX" and ends with "5usu," thereby linking the numbers in the Government's verified complaint and public notice. (Dkt. No. 17-3, ¶ 26). The Court finds this evidence is sufficient to "describe the [Defendant Cryptocurrency] with reasonable particularity" in satisfaction of Supplemental Rule G(4)(a)(ii)(A).[1]

**2. Notice to Known Claimants**

Second, Supplemental Rule G(4)(b)(i) requires that "the government must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential

---

[1] The Court previously found the Government had published public notice on an official forfeiture website from August 7, 2025 to September 5, 2025. (Dkt. No. 13, at 10 (citing Dkt. No. 5, at 3; Dkt. No. 9-2, ¶ 5)). The Government's public notice also "state[s] the times under Rule G(5) to file a claim and to answer" and "name[s] the government attorney to be served," as required by Supplemental Rule G(4)(a)(ii)(B) and (C). (*See* Dkt. No. 5, at 2).

claimant on the facts known to the government." The Court previously noted that the Government had submitted an affidavit stating that "[t]here are no known potential claimants in this case," (Dkt. No. 9-2, ¶ 4), without explaining whether it had "attempted to contact any email or mailing address associated with the Tether account seized." (Dkt. No. 13, at 11 (citing *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 4–5 (D.D.C. 2020); *United States v. Starling*, 76 F.4th 92, 96 n.2 (2d Cir. 2023)).

The Government has now submitted evidence of its efforts to identify any potential claimants for whom direct notice would be necessary. (*See* Dkt. No. 17-2, at 3; Dkt. No. 17-3, ¶¶ 18–20). In his supplemental affidavit, Special Agent Capone states that the Government requested Know Your Customer (KYC) information regarding the Target Wallet from Tether's Compliance Department, but that Tether did not provide any information in response. (Dkt. No. 17-3, ¶ 19). The Government then requested that Tether provide an FBI email address to any individual who contacted Tether regarding the frozen funds, and "maintained regular contact with Tether Compliance." (*Id.* ¶¶ 18, 20). Tether received several inquiries regarding the frozen wallet, but none left identifying information, nor made any claim to ownership. (*Id.* ¶ 20). Tether considered these inquiries suspicious and noted that they appeared to originate from an individual "monitoring our freezes in an effort to capitalize." (*Id.* ¶ 21). The inquiries appeared to be based in China and Tether advised their communication was "similar to a phishing attempt." (*Id.*). Only one individual ultimately contacted the FBI email address provided by Tether. (*Id.* ¶ 24). That individual claimed be a Singapore-based attorney representing an individual who the Government later determined was a second victim of the underlying fraud scheme. (*Id.*). The Government "hope[s]" that forfeited funds from the Defendant Cryptocurrency "will ultimately be used to compensate" the victims identified. (*Id.*).

The Government thus argues that none of the individuals that inquired about the frozen wallet "reasonably appear[] to be a potential claimant" such that direct notice is required under Supplemental Rule G. (Dkt. No. 17-2, at 3 (quoting Supp. R. G(b)(i)).[2] The Court agrees that the individuals whose inquiries were considered "suspicious" by Tether and did not make any claim to ownership do not reasonably appear to be potential claimants. *See Starling*, 76 F.4th at 96 n.2 ("The government need not provide formal service of process in a civil forfeiture proceeding; it must only give notice 'to any person who reasonably appears to be a potential claimant on the facts known to the government,' and it may do so by any 'means reasonably calculated to reach the potential claimant.'" (quoting Supp. R. G(4)(b)(i), (iii)(A))); *see also Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d at 6 ("With respect to the two potential claimants whom the government was unable to reach directly [because the claimants provided no functional contact information], notice via publication satisfied the government's obligations.").

The Court accordingly finds the supplemental evidence provided by the Government is sufficient to show direct notice under Supplemental Rule G is not required, as there are no known potential claimants aside from the two victims of the scheme.

**B. Sufficiency of the Verified Complaint under Supplemental Rule G(2)**

Supplemental Rule G(2) sets forth the requirements for an in rem forfeiture complaint. The Court previously found the Government had complied with Supplemental Rule G(2)'s requirements that the complaint be verified, that it state the grounds for jurisdiction and venue, that it describe the property with reasonable particularity, that it state the property's location

[2] The Government also argues it "would likely violate the Hague Service Convention if it were to send notice to any of the associated e-mail addresses." (Dkt. No. 17-2, at 3 (citing *Smart Study Co. v. Shenzhenshixindajixieyouxiangongsi*, 164 F.4th 164, 172 (2d Cir. 2025)). Because the Court finds the Government has provided sufficient evidence that there was no "person who reasonably appear[ed] to be a potential claimant" and direct notice was therefore not required, the Court makes no finding as to the effect of the Hague Service Convention on the Government's notice obligations under Supplemental Rule G.

when seizure occurred and when the action was filed, and that it state the statute under which the forfeiture action is brought. (Dkt. No. 13, at 11–12). However, the verified complaint did not "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f).

The standard of proof in a forfeiture in rem case is preponderance of the evidence. *See* 18 U.S.C. § 983(c)(1), (2). In order to show that the Defendant Cryptocurrency was "involved in" the commission of an offense, the Government must also meet its "burden of proving that 'there was a substantial connection between the property and the offense[s].'" *In re 650 Fifth Avenue*, 830 F.3d 66, 95 (2d Cir. 2016) (quoting 18 U.S.C. § 983(c)(3)); *see also United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 197–98 (2d Cir. 2013) (vacating summary judgment where it was plausible to infer that certain funds the Government sought to forfeit had been earned from legitimate sources).

The Government argues two forfeiture theories: (1) that Defendant Cryptocurrency "constitutes or is derived from proceeds traceable to" wire fraud, under 18 U.S.C. § 981(a)(1)(C); and (2) that Defendant Cryptocurrency is property "involved in a transaction or attempted transaction" in violation of federal money laundering statutes (or "traceable to such property"), under 18 U.S.C. § 981(a)(1)(A). (Dkt. No. 17-2, at 5; Dkt. No. 1, ¶ 1). The Court identified deficiencies in the Government's submissions as to both theories. (*See* Dkt. No. 13, at 14, 17–19).

**1. Forfeiture under Section 981(a)(1)(C)**

Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a

conspiracy to commit such offense." "Specified unlawful activity" within the meaning of section 1956(c)(7) includes wire fraud under 18 U.S.C. § 1343. *See id.* §§ 1956(c)(7)(A), 1961(1).

The Court previously found the verified complaint adequately alleged a wire fraud scheme to defraud investors of their cryptocurrency. (Dkt. No. 13, at 13–14). However, the "verified complaint [did] not adequately explain the sequence of transfers connecting the Victim to the Target Wallet where the Defendant Cryptocurrency was seized." (*Id.* at 14). It was therefore unclear whether the Defendant Cryptocurrency "constitutes or is derived from proceeds *traceable to*" the alleged wire fraud. (*Id.* (quoting 18 U.S.C. § 981(a)(1)(C))). The term "proceeds" here means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

Courts have found an account's funds are traceable to proceeds of a fraud scheme where the funds can be linked to a victim's stolen transfer and there is no evidence showing any legitimate use of the account. *See United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred Fifty-Three Dollars & Zero Cents Seized from JP Morgan Chase NA Acct. No. XXXXXXXXX Held in the Name of Jiawig Trade Inc.*, No. 23-cv-9585, 2025 WL 923412, at *5–6, 2025 U.S. Dist. LEXIS 57796, at *13–15 (E.D.N.Y. Mar. 27, 2025); *United States v. Fifty Thousand Six Hundred Ninety-Nine Dollars & Fifty Cents in U.S. Currency Seized From Bank of Am. Acct. No. XXXXXXXXXXXX Held in the Name of Knightsbridge Priv. Partners LLC*, No. 19-cv-5408, 2020 WL 8413547, at *6, 2020 U.S. Dist. LEXIS 106137, at *16 (E.D.N.Y. June 16, 2020), *report and recommendation adopted sub nom.*, *United States v. Fifty Thousand Six Hundred Ninety-Nine Dollars and Fifty Cents ($50,699.50)*, 2020 WL 7640021, 2020 U.S. Dist. LEXIS 240934 (E.D.N.Y. Dec. 22, 2020); *United States v. 0.40401694 Bitcoin*

*(BTC) Seized from Binance User ID 36895141*, No. 23-cv-218, 2025 WL 1262041, at *2, 2025 U.S. Dist. LEXIS 82127, at *4–5 (E.D. Tenn. Apr. 30, 2025), *aff'd*, No. 25-5611, 2026 WL 228831, 2026 U.S. App. LEXIS 2923 (6th Cir. Jan. 28, 2026).

For example, in *Knightsbridge*, the government's allegations linking the source of the accounts' funds to a fraud scheme, in addition to the fact that no interested party had filed a claim to dispute these allegations, was sufficient to establish a substantial connection between the funds and the wire fraud scheme. *See* 2020 WL 8413547, at *6, 2020 U.S. Dist. LEXIS 106137, at *16. Similarly, in *Jiawig*, the government identified three victims that had wired a total of $326,456 into the account and there were "no facts supporting that any legitimate funds flowed into the" account. *See* 2025 WL 923412, at *5, *8, 2025 U.S. Dist. LEXIS 57796, at *13, 23. Accordingly, the $326,456 in funds linked to victims was forfeitable as proceeds of the fraud scheme. *Id.*

Here, the Government argues that, although "the Defendant Cryptocurrency . . . is not directly traceable to a single originating source or victim," the property constitutes proceeds of wire fraud because tracing the activity "in reverse . . . leads back to accounts of at least two identifiable victims." (Dkt. No. 17-2, at 6). The Government cites Special Agent Capone's supplemental affidavit, in which he explains that "[t]he government's tracing followed Victim #1's funds into the Target Wallet" and that two different private investigation firms also independently traced the two victims' stolen funds into the Target Wallet. (Dkt. No. 17-3, ¶ 16). The Government has also provided two detailed charts and one spreadsheet showing a summary of the transactions between wallets. (*See id.* at 9–14).[3]

[3] *See United States v. 330,000.026094 USDT Tokens Seized from the Cryptocurrency Wallet Address Identified by 0X9AFC36B20C961CD34450AE0C3941C302B FD6B1F1*, No. 25-cv-555, 2025 WL 4648137, at *2–5, 2025 U.S. Dist. LEXIS 276079, at *3–14 (E.D. Va. Dec. 23, 2025) (Vaala, M.J.), *report and recommendation adopted*, 2026 WL 703931, 2026 U.S. Dist. LEXIS 51771 (E.D. Va. Mar. 12, 2026) (granting default judgment where Government

The Government does not "describe all transfers of funds because some of the transfers were broken down into many similar transactions and deposits, consolidated into larger 'group' wallets, nested into a wallet within another wallet, or split apart into several smaller transactions along the way." (*Id.* ¶ 10). Victim #1's initial transactions from Coinbase were made in Bitcoin (BTC). (*Id.* ¶ 11). Special Agent Capone states that Victim #1 sent approximately 4.8 BTC in six transactions from Coinbase to a wallet address ending in "bsAck." (*Id.* at ¶ 12). Funds were then consolidated with other unknown funds totaling 6.58 BTC and then split from BTC into Tether in two Ethereum addresses, which were then consolidated into a Tron address ending in "5Dg3J." (*Id.*). Finally, those funds were sent to the Tron address ending in "w5usu," *i.e.*, the Target Wallet. (*Id.*). The Government and two investigation firms concluded that the victims' stolen funds were traced into the "w5usu" wallet, and no person aside from the victims has made any legitimate claim to the funds in the Target Wallet. (*Id.* ¶ 16). Nor are there any facts indicating that the wallet had a legitimate use. According to the Government, 443,953 USDT of the funds in the Target Wallet is traceable to Victim #1, and 212,259 USDT is traceable to Victim #2, out of a total of 674,739 USDT in the subject wallet. (*Id.* ¶ 27).

However, the charts provided by the Government only appear to support that the amount originally transferred from Coinbase, presumably by Victim #1, was $276,000. (*Id.* at 10, 12). Further, although Special Agent Capone asserts that roughly 4.8 BTC were transferred from Coinbase to the "bsAck" wallet, the spreadsheet provided by the Government only shows approximately 4.14 BTC[4] that were transferred from Coinbase to that wallet, or a value of

submitted similar charts summarizing cryptocurrency transactions as evidence that the defendant property traceable to fraud proceeds).

[4] The Court notes that, in the Government's verified complaint, it had originally alleged that "[t]he Victim lost approximately 4.13 BTC to the scheme," which, on motion for default judgment, is deemed admitted. (Dkt. No. 1, ¶16).

$275,810.69 USD. (*Id.* at 14). As to Victim #2, Special Agent Capone stated that the Government "reviewed the tracing reports provided by [a private cryptocurrency tracing company] and confirmed their conclusion . . . that [the] Target Wallet contained 212,259.84 USDT that Victim #2 initially deposited via cmi.bio," a fictitious trading platform. (*Id.* ¶ 9). However, the Government has not provided any evidence tracing Victim #2's original stolen transfer amount to the Target Wallet.

Having reviewed the allegations and supplemental evidence, the Court finds that the Government has stated sufficiently detailed facts to support a reasonable belief that at least 275,810.69 USDT of the Defendant Cryptocurrency is traceable to proceeds of the wire fraud scheme. *See Sum of $185,336.07*, 731 F.3d at 197–98. Accordingly, the Government is entitled to forfeiture under section 981(a)(1)(C) of the 275,810.69 USDT of the Defendant Cryptocurrency that can be attributed to a victim of the wire fraud scheme. The Court need not consider whether the Government has met its burden of showing that the remaining 398,928.79021 USDT is subject to forfeiture under § 981(a)(1)(C), because the Court finds that it is forfeitable under § 981(a)(1)(A).

### 2. Forfeiture under Section 981(a)(1)(A)

The Government argues that the entirety of the Defendant Cryptocurrency, including the remaining 398,928.79021 USDT not traced to proceeds of the wire fraud scheme, is forfeitable because it was "involved in" money laundering and there is a "substantial connection" between the cryptocurrency and a money laundering offense under 18 U.S.C. §§ 1956 and 1957. (*See* Dkt. No. 17-2, at 6). Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property," is "subject to forfeiture to the United States."

The Court first considers whether the Government has stated sufficiently detailed facts to support a reasonable belief that the Defendant Cryptocurrency was more likely than not involved in a money laundering offense under Supplemental Rule G(2)(f). The Government has alleged that the Defendant Cryptocurrency was property involved in the violation of § 1956(a)(1)(B)(i), concealment money laundering, and § 1957(a), engaging in monetary transactions in property derived from specified unlawful activity. (Dkt. No. 1, ¶ 1; *see* Dkt. No. 13, at 17 ("[T]he Court reads the verified complaint to allege that the Victim's funds were involved in 'concealment' money laundering.'")). The Government has also argued, and the Court agrees, that digital currencies such as Tether "are 'monetary instruments' or 'funds' as set forth in 18 U.S.C. § 1956." (Dkt. No. 17-2, at 4 (citing, *inter alia*, *United States v. Iossifov*, 45 F.4th 899, 913 (6th Cir. 2022) ("[W]hile the terms 'monetary instrument' and 'funds' are not defined within the money laundering statute, courts that have addressed this question have unanimously determined that Bitcoin falls under those terms.") and *United States v. Ulbricht*, 31 F. Supp. 3d 540, 569–70 (S.D.N.Y. 2014) (concluding that Bitcoin falls within the purview of 18 U.S.C. § 1956))).

To establish a violation of § 1956(a)(1)(B)(i):

> [T]he government [must] prove that the defendants, (1) knowing that the property involved in a financial transaction[5] represented the proceeds of some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction[,] (3) which in fact involved the proceeds of that unlawful activity, (4) either (a) with the intent to promote the carrying on of that unlawful activity or (b) with the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

[5] Financial transactions include those that "in any way or degree affect[] interstate or foreign commerce . . . involving the movement of funds by wire or other means" or that involve "the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4); *see United States v. Budovsky*, No. 13-cr-368, 2015 WL 5602853, at *13, 2017 U.S. Dist. LEXIS 127717, at *34 (S.D.N.Y. Sep. 23, 2015). Financial institutions include foreign or domestic banks and currency exchanges. 18 U.S.C. § 1956(c)(6); 31 U.S.C. § 5312(a)(2).

*United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006). The specified unlawful activity alleged here is wire fraud, in violation of 18 U.S.C. § 1343. Because the Court finds the Government has met its burden of proof with respect to concealment money laundering, the Court does not address the § 1957 claim.

"[T]he concealment element of the money laundering statute requires that the purpose, not merely the effect, of the endeavor must be to conceal or disguise a listed attribute of the proceeds." *United States v. Garcia*, 587 F.3d 509, 512 (2d Cir. 2009) (citing *Cuellar v. United States*, 553 U.S. 550, 564–67 (2008)); *see also United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) ("*Cuellar* confirms that a conviction for . . . [§ 1956(a)(1)(B)(i)] money laundering . . . requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds."). Proof that the purpose of the transaction was to conceal may be established circumstantially if it can be inferred that the actors knew the transaction would have the relevant effects. *Cuellar*, 553 U.S. at 567 n.8.

The Second Circuit has indicated that property is "involved in" money laundering, and thus subject to forfeiture, when the property "serve[s] as a conduit for the proceeds of [] illegal transactions." *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (summary order) (quoting *United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995)). In *Schlesinger*, evidence showed that the defendant had "deposited the proceeds of his insurance and creditor fraud into the business operating accounts of the companies he ran at the [defendant] premises, and the proceeds were then used to pay the companies' monthly lease and tax expenses," rendering the premises subject to forfeiture. *Id.*

At least two courts have granted default judgment as to concealment money laundering forfeiture theories where the government stated that cryptocurrency linked to a fraud scheme had

been commingled and transferred through multiple wallets, indicating a concealment purpose. *See United States v. Approximately 927,155.442 USDT*, No. 25-cv-3914, 2026 WL 2454470, at *3, 2026 U.S. Dist. LEXIS 189217, at *10 (D.D.C. Aug. 21, 2026) (granting default judgment as to Tether cryptocurrency the Government alleged was obtained through pig butchering schemes and then "comingled and laundered through numerous cryptocurrency wallets . . . to conceal [the stolen funds'] location"); *United States v. 280 Virtual Currency Accts.*, No. 20-cv-2396, 2024 WL 2049002, at *5–6, 2024 U.S. Dist. LEXIS 83543, at *14–15 (D.D.C. May 8, 2024) (finding digital currency accounts were involved in concealment money laundering where conspirators "used several recognized money laundering techniques, such as chain hopping and Bitcoin conversions, to obscure the trail of funds" and "sought out OTC traders known to not . . . collect the legally required KYC information").

Here, the Government has adequately alleged that the Target Wallet and its contents, including the Defendant Cryptocurrency, were involved in money laundering with the intent to "disguise the nature, location, source, ownership, or control of the proceeds of the [wire fraud scheme]." *Gotti*, 459 F.3d at 334. As described in the Complaint, many of the "transfers that took place between the initial theft of the Victim's funds [and transfer to the Target Wallet] were broken down into many smaller transactions and deposits, consolidated into larger 'group' wallets, nested into a wallet within another wallet, or split apart into several smaller transactions along the way." (Dkt. No. 1, ¶ 20).

Special Agent Capone explains that the transaction "activity is consistent with money laundering and is commonly observed in pig butchering schemes" and "demonstrate[s] efforts [by the Subjects] to conceal the true origin of the funds." (Dkt. No. 17-3, ¶¶ 13, 10). For example, "blockchain analysis" shows "that victim funds had moved through numerous wallets

before being converted from BTC to USDT, and [that] then the USDT was ultimately transferred into the seized wallet." (*Id.* ¶ 13). Because each transaction triggers fees, it would be irrational for a subject "to needlessly transfer cryptocurrency through different accounts, incurring fees at each step," unless the subject has a concealment purpose. (*Id.* ¶ 14).[6] "Based on [Special Agent Capone's] training and experience and familiarity with investigating cryptocurrency crimes, multiple sender wallets and deposit wallets are trends that are indicative of digital money laundering due to the intentional obfuscation of funds." (*Id.*). The subjects' conversion of funds into Tether, a stablecoin variety, also signals a money laundering purpose, as a stablecoin allows users to more easily "'cash out' the funds" at the conclusion of the scheme. (*Id.* ¶ 15).

The Government argues that the allegations establish a substantial connection "because proceeds of a wire fraud scheme were commingled with other funds by way of splits, transfers, and consolidations before arriving in the Target Wallet." (Dkt. No. 17-2, at 6). The Government thus claims that the entirety of the account, including the funds not directly traceable to proceeds of wire fraud, is subject to forfeiture, because the remaining funds are substantially connected to money laundering. (*Id.* at 5). As the Court noted in its prior decision, (*see* Dkt. No. 13, at 18 n.8), courts in this Circuit have concluded that the entire contents of an account used to facilitate money laundering may be subject to forfeiture under § 981(a)(1)(A). *See, e.g.*, *Jiawig*, 2025 WL 923412, at *7–8, 2025 U.S. Dist. LEXIS 57796, at *21–24 (finding a substantial connection between money laundering and remaining funds where at least the other "sixty percent of the

[6] *See also United States v. 330,000.026094 USDT Tokens Seized from the Cryptocurrency Wallet Address Identified by 0X9AFC36B20C961CD34450AE0C3941C302B FD6B1F1*, No. 25-cv-555, 2025 WL 4648137, at *3, 2025 U.S. Dist. LEXIS 276079, at *9 (E.D. Va. Dec. 23, 2025) (Vaala, M.J.) (recommending that default judgment be granted under section 981(a)(1)(A) where the government had alleged that the defendant property had been "shuffled through several unhosted addresses in a manner that 'incurred an excessive amount of gas fees, which investors generally try to minimize'"), *report and recommendation adopted*, 2026 WL 703931, 2026 U.S. Dist. LEXIS 51771 (E.D. Va. Mar. 12, 2026).

Defendant Funds [was] attributable to known victims"); *United States v. Kenner*, 443 F. Supp. 3d 354, 381 (E.D.N.Y. 2020) (Bianco, J.).[7] In *Kenner*, for example, the court rejected the argument that only unlawful proceeds actually "obtained" by a fraudster were subject to forfeiture and held that commingled "investment funds, as a whole would be forfeitable." *Id.* The court reasoned that, "because 'the commingling of tainted funds with legitimate money . . . facilitates the laundering and enables it to continue,'" the entirety of the funds could be forfeited. *Id.* (quoting *United States v. Certain Funds on Deposit in Account No. 01-0-71416, Located at the Bank of New York*, 769 F. Supp. 80, 84–85 (E.D.N.Y. 1991)).

The Court thus finds the allegations and supplemental evidence submitted by the Government is sufficient to support a reasonable belief that the remaining Defendant Cryptocurrency funds were involved in concealment money laundering and has shown a substantial connection between the cryptocurrency and the money laundering offense.

* * *

Having found that the Government's verified complaint supports civil forfeiture of the Defendant Cryptocurrency under 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A), the Government's motion for default judgment is granted. *See* Supp. R. G(2).

---

[7] Several courts have also noted the complexity in tracing funds implicated in money laundering transactions, and have indicated that an entire account may be forfeitable even where there is evidence that some funds are legitimate. *See, e.g.*, *United States v. Miller*, 911 F.3d 229, 232 (4th Cir. 2018) ("Property involved in a money laundering offense is forfeitable in its entirety, even if legitimate funds have also been invested in the property."); *United States v. Contents of Acct. Nos. 208-06070 & 208-06068-1-2*, 847 F. Supp. 329, 335 (S.D.N.Y. 1994) (noting that "legitimate money . . . serve[s] to further disguise the source of the illegitimate funds and make the proceeds of the [] scheme more difficult to trace, and thereby facilitate [a] money laundering scheme"); *see also United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1355 (D.C. Cir. 2002) ("Allowing the mere commingling of legitimate funds to defeat a money laundering conviction so easily would wholly undermine Congress's intent and effectively nullify the offense"); *United States v. Silver*, 864 F.3d 102, 115 (2d Cir. 2017) ("We . . . adopt the majority view of our sister Circuits—that the Government is not required to trace criminal funds that are comingled with legitimate funds to prove a violation of Section 1957.").

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Government's renewed motion for default judgment, (Dkt. No. 17), is **GRANTED**; and it is further

**ORDERED** that a judgment of default be entered against the Defendant Cryptocurrency; and it is further

**ORDERED** that the Defendant Cryptocurrency is **FORFEITED** to the United States; and it is further

**ORDERED** that any claims to the Defendant Cryptocurrency are hereby forever barred; and it is further

**ORDERED** that the Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: November 16, 2026
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge